PUYALLUP TRIBE, INC., ET AL. *v.* DEPARTMENT OF GAME OF WASHINGTON ET AL.

No. 76–423.   Argued April 18, 1977—Decided June 23, 1977

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post,* p. 178. BRENNAN, J., filed an opinion dissenting in part, in which MARSHALL, J., joined, *post,* p. 179.

*William H. Rodgers, Jr.,* argued the cause for petitioners. With him on the briefs was *John Sennhauser.*

*Slade Gorton,* Attorney General of Washington, argued the cause for respondent Department of Game of Washington. With him on the brief was *Edward B. Mackie,* Deputy Attorney General.   *Don S. Willner* argued the cause and filed briefs for respondents Northwest Steelheaders Council of Trout Unlimited et al.

*H. Bartow Farr III* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Acting Solicitor General Friedman, Assistant Attorney General Taft, Edmund B. Clark,* and *George R. Hyde.**

---

*\*Joseph S. Fontana* filed a brief for the National Tribal Chairmen's Assn. as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed by *Mason D. Morisset, Alan C. Stay,* and *Michael Taylor* for the Colville Indian Tribe et al.; and by *Joseph T. Mijich* for the Purse Seine Vessel Owners Assn. et al.

MR. JUSTICE STEVENS delivered the opinion of the Court.

On April 8, 1975, after more than 12 years of litigation, including two decisions by this Court,[1] the Superior Court of the State of Washington for Pierce County entered a judgment against the Puyallup Tribe of Indians. That judgment recited that the court had jurisdiction to regulate the fishing activities of the Tribe both on and off its reservation, and limited the number of steelhead trout that members of the Tribe may catch with nets in the Puyallup River each year. The Tribe was directed to file a list of members authorized to exercise treaty fishing rights, and to report to the Washington State Department of Game, and to the court, the number of steelhead caught by its treaty fishermen each week. The judgment, with a slight modification, was affirmed by the Supreme Court of Washington, 86 Wash. 2d 664, 548 P. 2d 1058 (1976).

The Tribe, supported by the United States as *amicus curiae,* contends in this Court that the doctrine of sovereign immunity requires that the judgment be vacated, and that the state courts of Washington are without jurisdiction to regulate fishing activities on its reservation. The Tribe also argues that the limitation of the steelhead catch imposed by those courts is not, in any event, a necessary conservation measure. We hold that insofar as the claim of sovereign immunity is

---

[1] In *Puyallup Tribe* v. *Washington Game Dept.,* 391 U. S. 392 (*Puyallup I*), the Court held that Art. III of the Treaty of Medicine Creek, 10 Stat. 1133, did not foreclose reasonable state regulation, in the interest of conservation, of fishing by the Indians "in common with" fishing by others; the Court remanded the case to the state court to determine whether a total ban on net fishing was justified by the interest in conservation.

In *Washington Game Dept.* v. *Puyallup Tribe,* 414 U. S. 44 (*Puyallup II*), the Court held that a complete ban on net fishing for steelhead trout by the Indians was precluded by the treaty, and remanded for a determination of the number of catchable fish that should be apportioned to an Indian net fishery.

advanced on behalf of the Tribe, rather than the individual defendants, it is well founded, but we reject petitioner Tribe's other contentions.

I

The complaint as originally filed by respondent Department of Game of the State of Washington (hereafter respondent),[2] named 41 individuals, including "John Doe and Jane Doe, members [of the Tribe],"[3] as defendants. It alleged that the defendants, claiming to be immune from the State's conservation laws, were fishing extensively in the Puyallup River with set nets and drift nets in a manner which would virtually exterminate the anadromous fishery if not enjoined. Anadromous fish are those which spend most of their life in the open sea, but which return as adults to freshwater streams, such as the Puyallup River, to spawn. The steelhead is an anadromous fish. The prayer of the complaint sought a declaration that the defendants were bound to obey the State's conservation laws and an injunction against netting the runs of anadromous fish.

The trial court entered a temporary restraining order enjoining each of the defendants from netting fish in the Puyallup River, and directing that service be made on each defendant.

In response, a "Return on Temporary Restraining Order and Answer to Complaint" was filed by "the PUYALLUP TRIBE of INDIANS, by and through the Chairman of the Tribal Council, MR. JEROME MATHESON." App. in

---

[2] Respondent regulates steelhead fishing in the State of Washington. The Washington Department of Fisheries was a coplaintiff with respondent in the original complaint by virtue of its responsibility for salmon fishing. After this Court's decision in *Puyallup I*, the Department of Fisheries amended its regulation to allow members of the Tribe to use a net fishery for salmon. No issue relating to salmon fishing remains in the case.

[3] Three of the named individuals were further identified as tribal officers.

*Puyallup I,* O. T. 1967, No. 247, p. 8 (hereafter App. in *Puyallup I*). The return and answer used the term "tribe" in two senses, first as a collective synonym for the individual defendant-members,[4] and also as referring to a sovereign Indian nation.[5] It asserted an exclusive right to the fish in the Puyallup River, describing that right somewhat ambiguously as a "property right which belongs to the Tribe and is exercised by the Tribe members under the Treaty of Medicine Creek." *Ibid.* Therefore, while filed in the name of the Tribe, the return and answer was also tendered on behalf of the individual defendants.[6]

Throughout this long litigation the Tribe has continued to participate in the dual capacity of a sovereign entity[7] and as

---

[4] *I. e.,* "Answering Paragraph No. 1 these defendants being a tribe of Indians . . . ," App. in *Puyallup I,* p. 8; "the defendants have suffered numerous arrests, jailing and other indignities at the hands of the plaintiffs who knowingly and wilfully badger, abuse and degrade the defendants . . . ," *id.,* at 9; "[t]hat the plaintiffs are recklessly using the power of the State of Washington to deprive the defendant [*sic*] and each of them of their means of making a livelihood . . . ," *id.,* at 10.

[5] *I. e.,* "this Tribe of Indians signed a treaty with the United States of America as a sovereign nation of Indians . . ."; "the Puyallup Tribe of Indians own the fish in the river . . . ." *Ibid.*

[6] The trial court so found: "Defendants answered and alleged that they were members of the Puyallup Tribe of Indians . . . ." *Id.,* at 31, Finding of Fact I.

[7] The Tribe has been described several ways in the captions which have been filed over the years. In this Court this Term the Tribe has described itself as "Puyallup Tribe, Inc." The Washington Supreme Court has thrice noted that there is no such entity, see 86 Wash. 2d 664, 666 n. 1, 548 P. 2d 1058, 1062 n. 1 (1975). In *Puyallup I* the trial court held that the Tribe had ceased to exist; this holding was reversed by the Washington Supreme Court, 70 Wash. 2d 245, 252–253, 422 P. 2d 754, 758–759 (1967). It has therefore been settled in this case that, whatever its correct name may be, the Tribe is still in existence and is clearly recognized as such by the United States.

In this Court Ramona Bennett is a copetitioner with the Tribe. She

a representative of its members who were individual defend-ants.[8]   The Tribe has repeatedly asserted its sovereign immu-nity from suit, arguing that neither it nor Congress has waived that immunity.[9]

In *Puyallup I,* we addressed the problems of tribal immu-nity and state-court jurisdiction in a footnote:

"Petitioners in No. 247 argue that the Washington courts lacked jurisdiction to entertain an action against

appears in her capacity as chairwoman of the Puyallup Tribal Council. Accordingly, we treat this case as though the Tribe itself is the only peti-tioner in this Court and hereafter use the term "petitioner" to refer to the Tribe.

[8] On a few occasions individual tribal members have been represented by attorneys who filed appearances in the Superior Court for Pierce County.  On at least two occasions attorneys have filed appearances in the Washington Supreme Court in this capacity.  No such appearance has been filed since the decision in *Puyallup II* in 1973.  No appearance on behalf of an individual defendant was ever filed in this Court.  Nor does the record reveal any instance of an objection to the Tribe's representation of the individual defendants.  It is clear from the record that the major responsibility for the defense of the litigation has been assumed by the Tribe.

[9] It has relied on *Worcester* v. *Georgia,* 6 Pet. 515, and *United States* v. *United States Fidelity & Guaranty Co.,* 309 U. S. 506.  Only twice in this litigation has petitioner failed to clearly raise the issue of its tribal sovereign immunity.  The first time was in its first return and answer, *supra,* at 168–169.  The immunity issue was later presented to the trial court, however, and the court, in the course of concluding that the Puyallup Tribe had ceased to exist, held in its memorandum decision that "this argument about the tribe being a sovereign nation is without merit."  App. in *Puyallup I,* p. 18.  As already noted, n. 7, *supra,* the trial court's holding that the Tribe had ceased to exist was reversed by the Washington Su-preme Court.  Second, during the representation of the Tribe by the Solicitor General before this Court in *Puyallup II,* no mention was made of tribal sovereign immunity.  Congress has not given the Solicitor Gen-eral authority to waive the immunity of an Indian tribe.  *United States* v. *United States Fidelity & Guaranty Co., supra,* at 513; cf. *Ford Motor Co.* v. *Dept. of Treasury of Indiana,* 323 U. S. 459, 466–470.

the tribe without the consent of the tribe or the United States Government (citing *United States* v. *United States Fidelity & Guaranty Co.,* 309 U. S. 506, and *Turner* v. *United States,* 248 U. S. 354), viewing the suit as one to 'extinguish a Tribal communal fishing right guaranteed by federal Treaty.' This case, however, is a suit to enjoin violations of state law by individual tribal members fishing off the reservation. As such, it is analogous to prosecution of individual Indians for crimes committed off reservation lands, a matter for which there has been no grant of exclusive jurisdiction to federal courts." 391 U. S. 392, 396–397, n. 11.

Thus, *Puyallup I* settled an important threshold question in this case—regardless of tribal sovereign immunity, individual defendant-members of the Puyallup Tribe remain amenable to the process of the Washington courts in connection with fishing activities occurring off their reservation. That conclusion was predicated on two separate propositions worthy of restatement here.

First, even though the individual defendants were members of the Tribe and therefore entitled to the benefits of the Treaty of Medicine Creek, that treaty as construed by this Court does not confer the complete individual immunity they claim. The State may qualify the Indians' right to fish "at all usual and accustomed places." Specifically, we held that the "manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Id.,* at 398.

Second, whether or not the Tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members is permissible. The doctrine of sovereign immunity which was

applied in *United States* v. *United States Fidelity & Guaranty Co.,* 309 U. S. 506, does not immunize the individual members of the Tribe.[10]

Although only the Tribe had entered an appearance in this Court in *Puyallup I,* because of its representation of its individual members, jurisdiction over the individuals existed. And since the state court's jurisdiction over the individual members was settled by *Puyallup I,* neither in that review nor in *Puyallup II* was any further consideration given to the status of the Tribe itself as a sovereign. It was after our decision in *Puyallup II,* when the trial court was required to determine the portion of the steelhead run that could be allocated to net fishing by the members of the Tribe, that the state court first entered an order which, in terms, is directed to the Tribe rather than to the individual defendants. That order places a limit on the number of steelhead which all members of the Tribe may catch with nets, and also directs the Tribe to identify the members engaged in the steelhead fishery and to report the number of fish they catch each week. In the trial court, in the Supreme Court of Washington, and in this Court, the Tribe has attacked that order as an infringement on its sovereign immunity to which neither it nor Congress has consented.

The attack is well founded. Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe. This Court,

---

[10] That case involved an action brought in a federal court by the United States on behalf of the Choctaw and Chickasaw Nations to recover royalties under a mineral lease; defendant was the lessee's surety. In an earlier bankruptcy proceeding, the lessee had obtained a judgment for $9,060.90 pursuant to a cross-claim against the same tribes. In the *Fidelity* case the lessee's surety pleaded the earlier judgment as a bar to recovery in the action for royalties. We held that the earlier judgment was void in the absence of congressional authorization for a suit, 309 U. S., at 512–513. There were no individual parties to the proceeding.

*United States* v. *United States Fidelity & Guaranty Co., supra;* the Washington Supreme Court, see, *e. g., State ex rel. Adams* v. *Superior Court,* 57 Wash. 2d 181, 182–185, 356 P. 2d 985, 987–988 (1960); and the commentators, see, *e. g.,* U. S. Dept. of Interior, Federal Indian Law 491–494 (1958), all concur. Respondent does not argue that either the Tribe or Congress has waived its claim of immunity or consented to the entry of an order against it. And certainly, the mere fact that the Tribe has appeared on behalf of its individual members does not effect a waiver of sovereign immunity for the Tribe itself.

On the other hand, the successful assertion of tribal sovereign immunity in this case does not impair the authority of the state court to adjudicate the rights of the individual defendants over whom it properly obtained personal jurisdiction. That court had jurisdiction to decide questions relating to the allocation between the hatchery fish and the natural run, the size of the catch the tribal members may take in their nets, their right to participate in hook-and-line fishing without paying state license fees and without having fish so caught diminish the size of their allowable net catch, and like questions. Only the portions of the state-court order that involve relief against the Tribe itself must be vacated in order to honor the Tribe's valid claim of immunity.

## II

The Tribe vigorously argues that the majority of its members' netting of steelhead takes place inside its reservation,[11]

---

[11] The continued existence of the Puyallup Reservation has been a matter of dispute on which we express no opinion. The Ninth Circuit, relying on our decision in *Mattz* v. *Arnett,* 412 U. S. 481, held that the reservation did still exist, *United States* v. *Washington,* 496 F. 2d 620 (1974), cert. denied, 419 U. S. 1032. That decision predates our consideration of *DeCoteau* v. *District County Court,* 420 U. S. 425, and *Rosebud Sioux Tribe* v. *Kneip,* 430 U. S. 584.

and that, while our prior adjudications settled respondent's right to regulate off-reservation fishing in the interest of conservation, neither respondent nor the state court has jurisdiction over on-reservation fishing. The Tribe relies on both the Treaty of Medicine Creek, 10 Stat. 1132, and federal pre-emption of on-reservation Indian affairs, see *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 147–148.

Article II of the Treaty of Medicine Creek provided that the Puyallup Reservation was to be "set apart, and, so far as necessary, surveyed and marked out for their exclusive use" and that no "white man [was to] be permitted to reside upon the same without permission of the tribe and the superintendent or agent." It is argued that these words amount to a reservation of a right to fish free of state interference. Such an interpretation clashes with the subsequent history of the reservation and the facts of this case. Pursuant to two Acts of Congress, 27 Stat. 633, and c. 1816, 33 Stat. 565, the Puyallups alienated, in fee simple absolute, all but 22 acres of their 18,000 acre reservation. None of the 22 acres abuts on the Puyallup River.[12] Neither the Tribe nor its members continue to hold Puyallup River fishing grounds for their "exclusive use." On the contrary, it is undisputed that non-Indian licensees of respondent fish in great numbers within the reservation, and under the close supervision of respondent's wardens.[13]

[12] 70 Wash. 2d, at 253, 422 P. 2d, at 759 (*Puyallup I*). Counsel for petitioner intimated at oral argument that petitioner might contend in the future that it retained trust status title to the bed of the Puyallup River, Tr. of Oral Arg. 10. This contention is at odds with the otherwise uncontradicted findings below.

[13] The tribal members' right to fish "at all usual and accustomed grounds and stations," secured by Art. III of the treaty, continues to protect their right to fish on ceded lands within the confines of the reservation.

Although it is conceded that the State of Washington exercises civil and criminal jurisdiction within the reservation for most purposes, petitioner contends that it may not do so with respect to fishing.[14] Again with particular reference to the facts of this case, we also reject this contention.

Our construction of the Treaty of Medicine Creek in *Puyallup I* makes it perfectly clear that although the State may not deny the Indians their right to fish "at all usual and accustomed" places, the treaty right is to be exercised "in common with all citizens of the Territory." We squarely held that "the right to fish at those respective places is not an exclusive one." 391 U. S., at 398. Rather, the exercise of that right was subject to reasonable regulation by the State pursuant to its power to conserve an important natural resource.

In *Puyallup II* we directed the Washington State courts to devise a formula pursuant to which the steelhead catch could be "fairly apportioned" between Indian net fishing and non-Indian sport fishing. No such fair apportionment could be effective if the Indians retained the power to take an unlimited number of anadromous fish within the reservation. Speaking for the Court, Mr. Justice Douglas plainly stated that the power of the State is adequate to assure the survival of the steelhead:

> "We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until

---

[14] Washington has acquired "Pub. L. 280" jurisdiction over the Puyallup Reservation, much of which coexists with the city of Tacoma. Pub. L. No. 280, § 7, 67 Stat. 590; Wash. Rev. Code §§ 37.12.010–37.12.070 (1974). A provision of Pub. L. 280 exempts treaty fishing rights from state jurisdiction, however; 18 U. S. C. § 1162 (b).

the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets." 414 U. S., at 49.

The resource being regulated is indigenous to the Puyallup River. Virtually all adult steelhead in the river have returned after being spawned or planted by respondent upstream from the boundaries of the original Puyallup Reservation, which encompass the lowest seven miles of the river. Though it would be decidedly unwise, if Puyallup treaty fishermen were allowed untrammeled on-reservation fishing rights, they could interdict completely the migrating fish run and "pursue the last living [Puyallup River] steelhead until it enters their nets." *Ibid.*[15] In this manner the treaty fishermen could totally frustrate both the jurisdiction of the Washington courts and the rights of the non-Indian citizens of Washington recognized in the Treaty of Medicine Creek.[16] In practical effect, therefore, the petitioner is reasserting the right to exclusive

---

[15] The original complaint in this case alleged that, "[a]s a result of the defendants' fishery, the anadromous fish runs of the Puyallup River will be virtually exterminated if said fishery is permitted to continue." App. in *Puyallup I,* p. 6.

The ability of the on-reservation activity to completely destroy the resource in question has not been a factor in other cases which have rejected regulation, *Arnett* v. *Five Gill Nets,* 48 Cal. App. 3d 454, 463–464, 121 Cal. Rptr. 906, 912–913 (1975), cert. denied, 425 U. S. 907 (on remand from this Court, *Mattz* v. *Arnett, supra,* where the on-reservation fishing regulation question was reserved, 412 U. S., at 485); *People* v. *Jondreau,* 384 Mich. 539, 185 N. W. 2d 375 (1971); *State* v. *Arthur,* 74 Idaho 251, 261 P. 2d 135 (1953), cert. denied, 347 U. S. 937; *State* v. *McConville,* 65 Idaho 46, 139 P. 2d 485 (1943).

[16] "Article III. The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory." 10 Stat. 1133. As to the treaty fishermen,

control of the steelhead run that was unequivocally rejected in both *Puyallup I* and *Puyallup II*. At this stage of this protracted litigation, we are unwilling to re-examine those unanimous decisions or to render their holdings virtually meaningless. We therefore reject petitioner's claim to an exclusive right to take steelhead while passing through its reservation.

## III

Finally, petitioner states that the courts below have failed to apply a standard of conservation necessity in fashioning relief. We disagree. The trial court, on remand from our decision in *Puyallup II*, conducted a two-week trial which was dominated by expert testimony for both parties. From the testimony and accompanying exhibits the court determined the number of steelhead in the river and how many could be taken without diminishing the number in future years; the court then allocated 45% of the annual natural steelhead run available for taking to the treaty fishermen's net fishery.[17] The Washington Supreme Court affirmed, 86 Wash. 2d, at 684–687, 548 P. 2d, at 1072–1073. This is precisely what we mandated in *Puyallup II*, 414 U. S., at 48–49. In the absence of a focused attack on some portion of the Washington courts' factual determinations, we find no ground for disagreeing with them.[18]

---

this sentence effects a reservation of a previously exclusive right. But that language also recognizes that the right is to be shared in common with the non-Indian "citizens of the Territory."

[17] The courts below also held that the run of hatchery fish introduced into the Puyallup by respondent was not available to the treaty fishermen. The issue was not presented in the petition for certiorari, nor was it argued in petitioner's brief. Respondent did attempt to raise the issue in its untimely cross-petition for certiorari, and by its brief arguing affirmance. Because the question has no bearing on our decision of the questions presented by petitioner, we decline to decide it.

[18] But for the direction of relief against the Tribe, the order of the Superior Court is admirably narrow in scope and well suited to effect a

A practical problem is presented by our disposition. The limitation on the size of the net catch applies to all members of the Tribe. The respondent has no interest in how the catch is allocated among the Indians; its concern is with the total number of steelhead netted during each season, with obtaining information to make it possible to recommend a proper allocation in succeeding years, and with enforcement against individuals who may net fish after the allowable limit has been reached. On the other hand, the Tribe has a separate interest in affording equitable treatment to its members and in protecting those members from any mistaken enforcement efforts. For that reason, although it properly resists the authority of the state court to order it to provide information with respect to the status of enrolled members of the Tribe and the size of their catch, it may find that its members' interests are best served by voluntarily providing such information to respondent and to the court in order to minimize the risk of an erroneous enforcement effort. The state courts must continue to accord full respect to the Tribe's right to participate in the proceedings on behalf of its members as it has in the past without treating such participation as qualifying its right to claim immunity as a sovereign.

The judgment is vacated, and the case is remanded to the Supreme Court of Washington for further proceedings not inconsistent with the opinion.

*It is so ordered.*

Mr. Justice Blackmun, concurring.

I join the Court's opinion. I entertain doubts, however, about the continuing vitality in this day of the doctrine of tribal immunity as it was enunciated in *United States* v. *United States Fidelity & Guaranty Co.,* 309 U. S. 506 (1940).

---

minimum of intrusion upon the treaty fishermen's protected rights. The treaty fishermen are free to fish up to the limit imposed by the court without any restriction as to time, place, or method of fishing.

I am of the view that that doctrine may well merit re-examination in an appropriate case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting in part.

While I agree with the Court's resolution of the rather tangled sovereign immunity question in Part I of the opinion, I cannot agree with the Court's interpretation of the substantive rights of the Puyallup Indians under the Treaty of Medicine Creek.

When white settlers first began arriving in the western part of what is now Washington State, the Puyallup Indians, along with other tribes surrounding Puget Sound, were heavily dependent for their livelihoods on runs of salmon and steelhead that came up the rivers in great numbers to spawn. In the 1850's the first territorial Governor, Isaac I. Stevens, entered into a number of virtually identical treaties with representatives of these western Washington tribes to confine the Indians to reservation lands, and to open up the rest of the region to white settlers. One of these treaties was the Treaty of Medicine Creek, negotiated in 1854 by Governor Stevens with the Puyallups, the neighboring Nisqually Tribe, and other bands. That treaty gave the Puyallups a reservation at the southern end of Commencement Bay at the mouth of the Puyallup River.

The provisions for the Indians' all-important fishing rights stated:

> "Article II. There is . . . reserved for the present use and occupation of the said tribes and bands [reservation land which] shall be set apart, and, so far as necessary, surveyed and marked out *for their exclusive use* . . . .
> "Article III. The right of taking fish, at all usual and accustomed grounds and stations, *is further secured* to said Indians, in common with all citizens of the Territory . . . ." 10 Stat. 1132, 1133. (Emphasis supplied.)

As I understand the Court's reading of these provisions, with which I agree, Art. II guarantees *exclusive* use of the reservation, including *exclusive* fishing rights, to the Puyallups. Article III concerns fishing rights *off* the reservation, guaranteeing such rights at all "usual and accustomed grounds and stations," not, however, exclusively but "in common with all the citizens of the Territory."

The two questions presented are, *first,* what fishing rights do the Puyallup Indians have now, over 100 years after the signing of the treaty?; and, *second,* to what extent is the State of Washington empowered to limit those rights? We do not write on a clean slate as to either question in light of *Puyallup I,* 391 U. S. 392, decided in 1968, and *Puyallup II,* 414 U. S. 44, decided in 1973.

*Puyallup I* presented no question of the "extent of . . . reservation rights," but only the question of the power of the State "to enjoin violations of state [fishing regulations] by individual tribal members fishing off the reservation." 391 U. S., at 394, 397 n. 11.[1] *Puyallup I* held that Washington's power to regulate off-reservation fishing for salmon and steelhead by the Puyallups was limited to regulations necessary in the interest of conservation, *id.,* at 398, and remanded for a determination by the Washington State courts of reasonable and necessary conservation measures, and for an interpretation of the phrase "in common with all the citizens of the Territory" contained in Art. III of the treaty. The Washington Supreme Court's response on remand was to sustain a total ban on all net fishing for steelhead. 80 Wash. 2d 561, 497 P. 2d 171 (1972).[2] In consequence, the case returned here as *Puyallup II,* which held that the interpretation of Art. III as

---

[1] The question of whether the Puyallups' reservation continued to exist was not reached. 391 U. S., at 394 n. 1.

[2] The state court also sustained a regulation permitting some net fishing by the Puyallups for salmon. Review of that holding was not sought here.

permitting the total ban was erroneous. The Court again remanded the case, this time for a determination of a means of "fairly apportion[ing]" the steelhead run between the hook-and-line sports fishery and the Puyallups' net fishery. 414 U. S., at 48. It was again made explicit that only "off-reservation fishing," governed by Art. III of the treaty, was involved. *Id.,* at 45.

Before proceedings began on remand, the Court of Appeals for the Ninth Circuit decided a separate case in which the State of Washington challenged "the continued existence of the Puyallup Indian Reservation *and as a consequence, the right of the Puyallup Tribe of Indians to fish, free from state interference, on that part of the Puyallup River lying within the Reservation.*" Relying on *Mattz* v. *Arnett,* 412 U. S. 481 (1973), the Court of Appeals held "that the Puyallup Indian reservation continues to exist." *United States* v. *Washington,* 496 F. 2d 620, 621 (1974) (emphasis supplied). The Washington Supreme Court, referring to the "recently established, continuing existence of the Puyallup Reservation," accepted the holding of the Court of Appeals, but nevertheless concluded that the State was not foreclosed from exercising regulatory authority within the reservation. 86 Wash. 2d 664, 668–669, 548 P. 2d 1058, 1063–1064 (1976). The court construed Art. III of the treaty to require that the Puyallups be allocated 45% of the harvestable natural-run steelhead for their net fishery, and that the remaining 55% be allocated to the hook-and-line sports fishery. The court further held that none of the harvestable hatchery-bred steelhead should be allocated to the Puyallups' net fishery. Thus, despite its acceptance of the Court of Appeals' holding that the reservation still existed, the Washington Supreme Court applied Art. III of the treaty—limited by its terms to off-reservation fishing—to on-reservation fishing governed by Art. II.

Unlike either *Puyallup I* or *Puyallup II,* the case before

us must be determined under Art. II, which in plainest English provides for "exclusive" fishing rights for the Puyallups. Article II cannot be read, in my view, to sanction the apportionment of harvestable fish between the Puyallups and other fishermen. Nor has this Court ever decided whether a State has the power to regulate on-reservation fishing in the interest of conservation. See *Mattz* v. *Arnett, supra,* at 485.[3] I would therefore reverse. I would remand, as we did in *Mattz,* for a determination by the state courts in the first instance of what measures, if any, are necessary to regulate the Puyallups' on-reservation fishery for conservation purposes.[4]

---

[3] *Mattz* v. *Arnett* held that the Klamath River Reservation in California had not been extinguished, but intimated no view on the authority of California to regulate fishing on the reservation. 412 U. S., at 485. The Klamath River has an anadromous fishery comparable to that on the Puyallup River, in that fishermen allowed net fishing can prevent all fish in a given run from reaching their spawning grounds. On remand in *Mattz,* the California Court of Appeal expressed doubt that the State could regulate on-reservation fishing even in the interest of conservation, but did not decide the issue because the Indians' fishing activity was found not to be a sufficient threat to conservation to justify state regulation. *Arnett* v. *Five Gill Nets,* 48 Cal. App. 3d 454, 463–464, 121 Cal. Rptr. 906, 912–913 (1975), cert. denied, 425 U. S. 907 (1976).

[4] The degree of danger to the survival of the anadromous fishery in the Puyallup River posed by the Puyallups' net fishing has been a matter of dispute in this case from the beginning. The parties, even now, disagree about the willingness of the Puyallups to observe sound conservation practices. Compare Brief for Respondent 17–18 with Brief for Petitioners 11–12. The Puyallups apparently now carry on their off-reservation salmon net fishery under the supervision of the Federal District Court for the Western District of Washington. *United States* v. *Washington,* 384 F. Supp. 312, 420 (1974); Brief for Petitioners 12. District Judge Boldt in that case found that none of the fishing tribes of western Washington, including the Puyallups, have conducted their off-reservation fisheries in such a way as to endanger any species:

"With a single possible exception testified to by a highly interested witness . . . and not otherwise substantiated, notwithstanding three years of exhaustive trial preparation, neither Game nor Fisheries has discovered

The Court tries to avoid the force of this analysis by denigrating the holding of the Court of Appeals for the Ninth Circuit. The Court states: "The continued existence of the Puyallup Reservation has been a matter of dispute on which we express no opinion. . . . [The Ninth Circuit's] decision predates our consideration of *DeCoteau* v. *District County Court*, 420 U. S. 425, and *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584." *Ante*, at 173 n. 11. This, to say the least, is a casual disregard of settled principles of res judicata and collateral estoppel. The United States and the State of Washington were parties to the action in the Court of Appeals, and surely we must assume, in the absence of any suggestion to the contrary, that the parties fully litigated their positions respecting reservation status. The Court of Appeals squarely held, contrary to the contention of the State of Washington, that the reservation continued to exist, and review here was denied. *Washington* v. *United States*, 419 U. S. 1032 (1974). The Supreme Court of Washington in the case now before us accepted the Ninth Circuit's holding as federal law binding on it. It is inappropriate now for the Court to denigrate the impact of that holding, particularly when the result is to vest authority in the State that lost on just that issue in the Court of Appeals.

The Court also questions whether on-reservation fishing is at issue in this case, relying on the fact that the Puyallups have alienated almost all of their land, and that only 22 acres of the reservation now remain in trust status. *Ante*, at 174. The Court does not go so far as to deny the existence of the reservation, and, of course, selling reservation land to non-Indians can be "completely consistent with continued reservation status," *Mattz* v. *Arnett, supra*, at 497; *Rosebud*

---

and produced any credible evidence showing any instance, remote or recent, when a definitely identified member of any plaintiff tribe exercised his off reservation treaty rights by any conduct or means detrimental to the perpetuation of any species of anadromous fish." 384 F. Supp., at 338 n. 26.

*Sioux Tribe* v. *Kneip,* 430 U. S. 584, 586–587 (1977); *DeCoteau* v. *District County Court,* 420 U. S. 425, 432, 444 (1975). Nor does the Court, or indeed any party, contend that somehow the sale of most of the lands included the sale of the exclusive fishing rights the Puyallups were granted by Art. II. The Court's argument seems to be that since the Puyallups do not now "hold Puyallup River fishing grounds for their 'exclusive use' " they have forfeited any claim to enforce their exclusive fishing rights under Art. II. *Ante,* at 174. This analysis ignores the fact that the Puyallups do not now hold their fishing grounds for their exclusive use precisely because the State has relentlessly sought for many years to prevent their doing so. Indeed, this very suit was begun 14 years ago in an effort to prevent the Puyallups from exercising what they claimed to be their treaty rights on their old reservation.

Today's decision, ironically, is at odds with the position taken by the State in another case involving Indian fishing rights in Puget Sound. There the State agreed that on-reservation fishing is not subject to regulation by the State. In *United States* v. *Washington,* 384 F. Supp. 312, 332 (WD Wash. 1974), aff'd, 520 F. 2d 676 (CA9 1975), cert. denied, 423 U. S. 1086 (1976), District Judge Boldt, construed the language of Art. II of the Treaty of Medicine Creek and that of virtually identical treaties entered into by Governor Stevens with other western Washington tribes to mean that "[a]n *exclusive* right of fishing was reserved by the tribes within the area and boundary waters of their reservations, wherein tribal members might make their homes if they chose to do so." (Footnote omitted; emphasis in original.) This proposition was apparently so self-evident to the parties, including the State of Washington, that "[a]ll parties in this case agree[d] that on reservation fishing is not subject to state regulation . . . ." 384 F. Supp., at 341.[5]

---

[5] This decision was handed down a month and a half before the Court of Appeals for the Ninth Circuit decided in *United States* v. *Washing-*

Doubtless 14 years of litigation have made the Court anxious to bring this case to an end, and this explains today's holding—just broad enough to dispose of the Puyallups' substantive claims but so narrowly fact-specific that it will probably have no significant impact on the Puget Sound Indian fishing rights case still pending in the District Court. This suggests that the result would not be the same were the case here for the first time instead of the third. For the language of the treaty is very clear: On-reservation fishing is governed by Art. II.

I respectfully dissent.

---

*ton*, 496 F. 2d 620 (1974), that the Puyallups' reservation continued to exist. On appeal from Judge Boldt's decision, the State challenged certain aspects of the calculation of the allocation under Art. III related to on-reservation catches, but it appears never to have asserted that it had authority to regulate the on-reservation fishery. The Court of Appeals affirmed Judge Boldt's decision in all relevant respects, 520 F. 2d 676, 690 (1975), and nowhere suggested that on-reservation fishing by the Puyallups was to be treated differently from that of any other tribe. The Court of Appeals affirmed Judge Boldt's decision over a year after it found that the Puyallups' reservation had never been extinguished.