**BURLINGTON NORTHERN
RAILROAD COMPANY,**
Plaintiff–Appellant,

v.

The **BLACKFEET TRIBE OF the
BLACKFEET INDIAN RESERVA-
TION**; Blackfeet Tribal Business Coun-
cil; Blackfeet Tax Administration Divi-
sion; Earl Old Person, Chairman; Ar-
chie St. Goddard, Vice–Chairman; Mar-
vin Weatherwax, Secretary; Eloise C.
Cobell, Treasurer, Defendants–Appel-
lees.

**BURLINGTON NORTHERN
RAILROAD COMPANY,**
Plaintiff–Appellant,

v.

**FORT PECK TRIBAL EXECUTIVE
BOARD**; Fort Peck Tribal Tax Com-
mission; Assiniboine & Sioux Tribes of
the Fort Peck Indian Reservation;
Kenneth E. Ryan, Tribal Chairman;
Paula Brien, Tribal Secretary/Account-
ant, Defendants–Appellees.

Nos. 88–4428, 88–4429.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 8, 1990.

Decided Jan. 25, 1991.

As Amended March 18, 1991.

Michael E. Webster, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Montana, for plaintiff-appellant.

Reid Peyton Chambers, Sonosky, Chambers & Sachse, Washington, D.C., Jeanne S. Whiteing, Whiteing, Thompson & White, Boulder, Colo., for defendants-appellees.

Before KOELSCH, BROWNING and BEEZER, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

Burlington Northern Railroad brought suit against the Blackfeet, Assiniboine and Sioux Tribes ("Tribes"), their governing bodies and various tribal officials, seeking a declaration that the Tribes lacked sovereign power to tax Burlington Northern's on-reservation rights of way, and an injunction against the imposition of such taxes.[1] The district court denied the Tribes' motion to dismiss on the ground of sovereign immunity, but granted the Tribes' motion for summary judgment on the merits. We grant dismissal of the Tribes and the governing bodies of Tribal officials acting in their official capacities as immune from suit. We affirm the grant of summary judgment.

I

In late 1886 and early 1887, the United States and the Tribes entered into an agreement creating the Blackfeet, Fort Peck and Fort Belknap Reservations, substantially as they are today. This agreement was ratified and codified by Congress on May 1, 1888, 25 Stat. 113 ("Act of 1888"). Article VIII of the agreement, incorporated in the statute, provides:

> It is further agreed that, whenever in the opinion of the President the public interests require the construction of railroads, or other highways, or telegraph lines, through any portion of either of the separate reservations established and set apart under the provisions of this agreement, right of way shall be, and is hereby, granted for such purposes, under such rules, regulations, limitations, and restrictions as the Secretary of the Interior may prescribe; the compensation to be fixed by said Secretary and by him expended for the benefit of the Indians concerned.

Art. VIII, 25 Stat. at 115–16.

The parties agree that in 1887, after the agreement was signed but before its ratification, Congress granted Burlington Northern's predecessor-in-interest right of way through what would become the Fort Peck Reservation, occupied by the Assiniboine and Sioux Tribes. *See* Act of Febru-

---

**1.** Burlington Northern originally brought two suits: one against the Blackfeet Tribe and the other against the Assiniboine and Sioux Tribes. The district court decided the cases together (*see* *Burlington N. R.R. v. Fort Peck Tribal Executive Bd.*, 701 F.Supp. 1493 (D.Mont.1988)) and we consolidate them on appeal.

ary 15, 1887, 24 Stat. 402 ("Act of 1887"). Pursuant to § 4 of the Act, the Secretary of the Interior fixed the terms and conditions of the right of way and the railroad paid the required compensation. The parties further inform us that in 1980 Burlington Northern's predecessor was granted a similar right of way across the Blackfeet Reservation.

In late 1986 the Blackfeet Tribe imposed a tax on all non-exempt possessory interests within the boundaries of the Blackfeet Reservation. In early 1987 the Assiniboine and the Sioux Tribes imposed a tax on all non-exempt utility property within the boundaries of the Fort Peck Reservation. Both taxes were approved by the Secretary of the Interior in 1987. Both apply by their terms to Burlington Northern's rights of way. Burlington Northern challenges both.

## II

The Tribes contend this suit is barred by the Tribes' sovereign immunity.[2] We decide this issue de novo. *See Pan Am. Co. v. Sycuan Band of Mission Indians,* 884 F.2d 416, 418 (9th Cir.1989).

Indian tribes and their governing bodies possess common-law immunity from suit. They may not be sued absent express and unequivocal waiver of immunity by the tribe or abrogation of tribal immunity by Congress. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58–59, 98 S.Ct. 1670,

1676–77, 56 L.Ed.2d 106 (1978). Neither exception applies here.[3]

But sovereign immunity does not extend to officials acting pursuant to an allegedly unconstitutional statute. *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 156–57 n. 6, 98 S.Ct. 988, 993–94 n. 6, 55 L.Ed.2d 179 (1978); *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 690 & n. 22, 69 S.Ct. 1457, 1461 & n. 22, 93 L.Ed. 1628 (1949); *Ex parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). No reason has been suggested for not applying this rule to tribal officials, and the Supreme Court suggested its applicability in *Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677. We strongly implied, without deciding, that *Ex parte Young* does apply to tribal officials in *Chemehuevi Indian Tribe v. Calif. Bd. of Equalization,* 757 F.2d 1047, 1051–52 (9th Cir.), *rev'd in part on other grounds,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985) and *California v. Harvier,* 700 F.2d 1217, 1218–20, 1220 n. 1 (9th Cir.1983). We now reach the issue, and conclude that tribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law. *Harvier,* 700 F.2d at 1221, 1224 (Norris, J., dissenting). Accordingly, tribal officials are not immune from suit to test the constitutionality of the

---

**2.** The Tribes also contend the suit should be dismissed for failure to exhaust tribal and administrative remedies. Although the Tribes failed to cross-appeal from the district court's denial of their motion to dismiss on these grounds, they may "urge on appeal, without taking a cross-appeal, any matter on the record to support the judgment rendered below." *United States v. 101.80 Acres of Land,* 716 F.2d 714, 727 n. 24 (9th Cir.1983). Burlington Northern's failure to exhaust is not a bar to jurisdiction, *see Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976 n. 8, 94 L.Ed.2d 10 (1987), and the district court did not abuse its discretion by reaching the merits. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation,* 873 F.2d 1221, 1229 (9th Cir.1989) (prudential exhaustion subject to abuse of discretion standard). The complaint presents issues of federal, not tribal, law; no proceeding is pending in any tribal court; the tribal court possesses no special expertise; and exhaustion would not have assisted the district court in deciding federal law issues. *Cf. National Farmers Union*

*Ins. Co. v. Crow Tribe,* 471 U.S. 845, 857, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985).

**3.** The Tribes are immune from suit even though the complaints allege the *Tribes* acted beyond their authority, *Chemehuevi Indian Tribe v. California State Bd. of Equalization,* 757 F.2d 1047, 1052 (9th Cir.), *rev'd in part on other grounds,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985), and even though Burlington Northern seeks only "affirmative" relief. *See, e.g., Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677 ("Nothing on the face of [the Indian Civil Rights Act] purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief."); *Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 478 (9th Cir. 1985) (suit for declaratory and injunctive relief, as well as damages, barred by tribal immunity); *see also Chemehuevi,* 757 F.2d at 1052 n. 6 ("[tribal] sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation").

taxes they seek to collect. *Tenneco Oil Co. v. Sac and Fox Tribe of Indians,* 725 F.2d 572, 574 (10th Cir.1984); *Wisconsin v. Baker,* 698 F.2d 1323, 1332–33 (7th Cir. 1983).

The Assiniboine and Sioux Tribes concede this. The Blackfeet Tribe contends their officials are not amenable to suit, relying on *United States v. Yakima Tribal Court,* 806 F.2d 853, 861 (9th Cir.1986), and *Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 479–80 (9th Cir.1985). But *Yakima* and *Hardin* hold only that tribal immunity extends to tribal officials acting in their representative capacity and within the scope of their *valid* authority. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. at 695, 69 S.Ct. at 1464 ("if the actions of an officer do not conflict with the terms of his *valid* statutory authority, then they are the actions of the sovereign [which] . . . cannot be enjoined or directed") (emphasis added); *accord Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1321 (9th Cir.1983); *United States v. Oregon,* 657 F.2d 1009, 1012 n. 8 (9th Cir. 1982).[4]

### III

We turn to the merits. "[T]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982) (quoting *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152, 100 S.Ct. 2069, 2080, 65 L.Ed.2d 10 (1980)). Burlington Northern contends the Tribes lacked the power to impose the challenged taxes because: (A) the rights of way are not on trust lands, (B) Burlington Northern's activities within the boundaries of the reservations do not significantly involve the Tribes, and (C) the Tribes have been divested of their sovereign power to tax. We address each contention in turn.

### A

█ The Acts of 1874 and 1888 set aside reservation lands for the "use and occupation" of the Tribes. Burlington Northern argues this phrase limits the Tribes' rights to those directly related to use and occupation of the land, and this interest is not sufficient to support the right to tax. As the Supreme Court has long held, however, "the right of occupancy with all its beneficial incidents [is] . . . as sacred as the fee." *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 115, 58 S.Ct. 794, 797, 82 L.Ed. 1213 (1938); *accord United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941); *Mitchel v. United States,* 34 U.S. (9 Pet.) 711, 745, 9 L.Ed. 283 (1835). Although the United States technically "owns" reservation lands, holding them in trust for the Tribes, *see, e.g., Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 175, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989), the Tribes retain "beneficial ownership." *See Shoshone Tribe,* 304 U.S. at 116–18, 58 S.Ct. at 797–98. The Tribes' interest includes all rights normally associated with "fee simple absolute title," *id.* at 117, 58 S.Ct. at 798, and may be diminished only by clear expression of congressional intent. *See, e.g., County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247–48, 105 S.Ct. 1245, 1258–59, 84 L.Ed.2d 169 (1985).

No intent to transfer the Tribes' interest in the land except as necessary for use as a right of way is reflected in the grants to Burlington Northern.[5] As earlier noted,

---

**4.** *Puyallup Tribe, Inc. v. Washington Department of Game,* 433 U.S. 165, 172–73, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977), in contrast, involved a suit against tribal officials based on their rights and obligations as individuals.

**5.** Burlington Northern argues that an easement for construction and operation of a railroad was necessarily exclusive, and therefore precluded any use and occupancy remaining in the Tribes. This is equivalent to the argument rejected in *Merrion,* 455 U.S. at 137, 102 S.Ct. at 901, that the Tribes' power to tax derives solely from the power to exclude. The grant of an exclusive easement did not extinguish the Tribes' title. *United States v. Soldana,* 246 U.S. 530, 532–33, 38 S.Ct. 357, 358, 62 L.Ed. 870 (1918).

the right of way across the Blackfeet and Fort Peck Reservations was granted by Congress in the Act of 1887. As Burlington Northern itself argues, the language of the Act of 1887 [6] is substantially similar to that found in the Act of March 3, 1875, 18 Stat. 482, which granted railroads rights of way across public lands other than lands within Indian reservations. The Supreme Court has held the latter act "clearly grants only an easement, and not a fee," *Great N. Ry. Co. v. United States*, 315 U.S. 262, 271, 62 S.Ct. 529, 532, 86 L.Ed. 836 (1942)—conveying no "more than a right of passage." *Id.* at 275, 62 S.Ct. at 534. The reasons upon which the Supreme Court relied apply equally to the Act of 1887. The Act of 1887, like the Act of 1875, granted " 'the,' not a, 'right of way.' " *Id.* at 271, 62 S.Ct. at 532. The Act of 1887 speaks of a right of way passing *"across"* the reservations; the Act of 1875 spoke of rights of way as passing *"over"* public land. *Id.* at 271–72, 62 S.Ct. at 532–33. The Act of 1887, like the Act of 1875, was enacted in a period in which public policy had shifted against "outright grants of public lands to private railroad companies." *Id.* at 274, 62 S.Ct. at 534. Burlington Northern's argument that the grant in the Act of 1887 was *"in praesenti"* and therefore vested immediately is not persuasive; the issue is not when the grant vested, but rather what rights it included when it did vest. In sum, we see no reason to interpret the Act of 1887 as granting the railroads a greater interest than did the Act of 1875.

This interpretation is strengthened by Section 5 of the Act of 1887, which provides "the right of way across lands occupied or reserved for military purposes ... is hereby granted to said company the same as across said Indian reservations." It is unlikely Congress after granting the railroads only an easement across unoccupied public lands in the Act of 1875, as the Supreme Court has held Congress did, *Great N. Ry. Co. v. United States*, 315 U.S. at 275, 62 S.Ct. at 534, would have granted the railroads a right of way in fee simple across reservation and hence military lands two years later in the Act of 1887. *Cf. .id.*

Burlington Northern argues the grant of rights of way completely extinguished the Tribes' interest in the land because Burlington Northern's predecessor-in-interest was required to pay the Tribes compensation. But compensation is equally consistent with a grant of an easement or a fee, and weighs in favor of neither.

Burlington Northern argues that Congress, by the Act of 1887, had already granted Burlington Northern right of way across the reservations before Congress ratified the earlier agreements with the Tribes, by adopting the Act of 1888 establishing the reservations' boundaries. Thus, the Tribes had no property interest left in the right of way to which the Act of 1888 could apply. However, the agreement embodied in the Act of 1888 was signed by the Tribes and representatives of the United States before the Act of 1887 was passed. The language of the Act of 1887 closely tracks that of the agreement, and the legislative history clearly indicates Congress passed the Act with the agreement, and particularly Article VIII, in mind. *See* H.R.Rep. No. 3487, 49th Cong., 2d Sess. 2 (1886); *Burlington Northern*, 701 F.Supp.

---

**6.** The Act of 1887 provides:

[Sec. 1.] ... That the right of way is hereby granted, as hereinafter set forth, to [Burlington Northern's predecessor-in-interest], for the extension of its railroad through [what is now the Blackfeet and Fort Peck Reservations].

. . . .

Sec. 4. That it shall be the duty of the Secretary of the Interior to fix the amount of compensation to be paid the Indians for such right of way, and provide the time and manner for the payment thereof, and also to ascertain and fix the amount of compensation to be made individual members of the tribe for damages sustained by them by reason of the construction of said road; but no right of any kind shall vest in said railway company in or to any part of the right of way herein provided for until ... the compensation aforesaid has been fixed and paid ... and the ... operation of such railroad shall be conducted ... in accordance with such ... regulations as the Secretary of the Interior may make....

Sec. 5. That the right of way across lands occupied or reserved for military purposes along the line of said railroad is hereby granted to said company the same as across said Indian reservations....

at 1501–02; *cf. Clairmont v. United States*, 225 U.S. 551, 556, 32 S.Ct. 787, 788, 56 L.Ed. 1201 (1912) (Indian tribes surrendered in writing " 'all the right, title, and interest' " in the railroad rights of way they may have had by virtue of earlier treaties). Acts of Congress will not be construed to extinguish Indian property or treaty rights unless that intent is clearly and plainly expressed. *E.g., County of Oneida*, 470 U.S. at 247–48, 105 S.Ct. at 1258–59. Congress did not say it intended to abrogate the Tribes' property interests when it passed the Act of 1887, and we are not persuaded Congress did so.

Burlington Northern's argument that the Act of 1888 simultaneously extinguished the Tribes' rights in the land within the right of way across the reservations while granting them to the railroad merely restates arguments we have already rejected. We find no clear expression Congress intended the Act of 1888 to extinguish the Tribes' property interest.

The Tribes' power to tax nonmembers derives from the Tribes' continuing property interest. Like the continuing property interest in the leases at issue in *Merrion*, 455 U.S. at 141–42, 102 S.Ct. at 903–04, this interest was not extinguished by the right-of-way grant.

**B**

■■■ Tribes retain the authority "to tax the activities or property of non-Indians taking place or situated on Indian lands, in cases where the tribe has a significant interest in the subject matter." *Confederated Tribes of Colville Indian Reservation*, 447 U.S. at 153, 100 S.Ct. at 2081. Here, the Tribes have a significant interest because Burlington's activities involve use of tribal lands and because Burlington is the recipient of tribal services. *See id.* at 156–57, 100 S.Ct. at 2082–83. Burlington

Northern receives the intangible benefits of a civilized society, *see Cotton Petroleum*, 109 S.Ct. at 1714, and the tangible benefits of police and fire protection. To permit taxation of the railroad's property, the benefits need not "equal the amount of [Burlington Northern's] tax obligations." *Id.*

Burlington argues the operations of the railroad may not be taxed because these operations are not based upon a consensual relationship with the Tribes and are not controlled by the Tribes but by state and federal authorities. The relevant question is not whether Burlington Northern's activities on the reservation were consensual or subject to control by the Tribes [7] but whether Burlington Northern receives benefits from the Tribes for which it may be taxed. The answer to that question is yes.

**C**

■■■ If Congress has divested the tribes of authority to tax, it matters not whether the activity sought to be taxed occurs on trust lands or receives benefits from involvement with the Tribe. However, as the Supreme Court said in *Merrion*, 455 U.S. at 149, 102 S.Ct. at 908, "we reiterate here our admonition in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60, 98 S.Ct. 1670, 1678, 56 L.Ed.2d 106 (1978): 'a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent.' " [8]

Burlington Northern contends when Congress adopted the Acts of 1887 and 1888 Congress did not intend the Tribes to have the power to tax railroads because the Tribes were "viewed as being outside the white man's culture," Appellant's Opening Brief at 22, and "unprepared to function independently in 19th Century American

---

7. If a consensual relationship was necessary, the Tribes consented to railroad rights of way by joining in Article VIII of the agreement ratified by the Act of 1888 and Burlington Northern chose to run rail lines through the reservations by voluntarily applying for rights of way.

8. In 1982 the Supreme Court wrote "[F]ederal law to date has not worked a divestiture of Indian taxing power." *Merrion*, 455 U.S. at 149, 102 S.Ct. at 908 (quoting *Colville Indian Reservation*, 447 U.S. at 152, 100 S.Ct. at 2080). So far as we have been informed, that statement remains true today.

life." *Id.* at 25; *see also* Reply Brief at 22–24. As the Supreme Court noted in *Merrion,* however, the Senate Judiciary Committee in a report issued in 1879 stated:

> "We have considered [Indian tribes] as invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress. Subject to the supervisory control of the Federal Government,[9] they may enact the requisite legislation to maintain peace and good order, improve their condition, establish school systems, and aid their people in their efforts to acquire the arts of civilized life; and *they undoubtedly possess the inherent right to resort to taxation to raise the necessary revenue for the accomplishment of these vitally important objects*—a right not in any sense derived from the Government of the United States."

*Merrion,* 455 U.S. at 140, 102 S.Ct. at 903 (quoting S.Rep. No. 698, 45th Cong., 3d Sess., 1–2 (1879) (emphasis added by the Court)).

Burlington Northern also contends Congress implicitly divested the Tribes of authority to tax Northern Pacific's property by passage of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4–R Act"). Indian tribes are not mentioned in the 4–R Act's comprehensive regulatory scheme or the 15–year legislative history of that Act. *See Burlington N. R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 457, 107 S.Ct. 1855, 1857, 95 L.Ed.2d 404 (1987). Burlington Northern treats this silence as a "clear indication" that Congress intended to divest the Tribes of their authority to tax railroads. We conclude otherwise.

Congress intended the 4–R Act to end discriminatory taxation by the states, and, not surprisingly, section 11503(b) addresses only state taxation. The silence as to Indian tribes does not "clearly" indicate Con-

gress intended to restrict tribal taxation; more likely it indicates Congress did not consider the subject. *See Merrion,* 455 U.S. at 148 n. 14, 150–52, 102 S.Ct. at 907 n. 14, 908–09.

Burlington Northern's argument that the "complex regulatory scheme" found in the 4–R Act and other federal enactments preempts the Tribes' power to *regulate* railroads is irrelevant. The Tribes have not attempted to regulate Burlington Northern; they have merely imposed a tax "to defray the cost of providing governmental services." *Merrion,* 455 U.S. at 137, 102 S.Ct. at 901.

## IV

Burlington Northern contends that if the Tribes have the power to tax, the Tribal taxes imposed here violate the 4–R Act and the Commerce Clause.

### A

■ Section 11503(b) of the 4–R Act prohibits "a State, subdivision of a State, or authority acting for a State or subdivision of a State" from imposing any "tax that discriminates against a rail carrier." 49 U.S.C. § 11503(b)(4). By its plain language, section 11503(b) applies only to the states and subdivisions thereof. This plain language controls "in the absence of a clearly expressed legislative intent to the contrary." *Burlington N. R.R. v. Oklahoma Tax Comm'n,* 481 U.S. at 461, 107 S.Ct. at 1860 (internal quotations omitted).

Throughout extensive Congressional consideration of the 4–R Act only taxation by the states and their subdivisions was at issue. Burlington Northern does not contradict this assertion but rather argues the intent of Congress cannot be achieved unless the 4–R Act limits the taxing power of Indian tribes as well as of the states. But once again, we may not impute a meaning to a statute not clearly there when to do so would abrogate Indian rights. *See County of Oneida,* 470 U.S. at 247–48, 105 S.Ct. at 1258–59; *see also* F. Cohen, Handbook of

9. The Secretary of the Interior, through the Bureau of Indian Affairs, exercised the requisite supervisory control by approving the taxes at issue in this case.

Federal Indian Law 283 (1982 ed.) ("congressional intent to override particular Indian rights [must] be clear").[10] We conclude the 4–R Act does not apply to the Tribes.

**B**

 We also reject Burlington Northern's challenge to tribal taxation under the Interstate Commerce Clause. In *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 190–93, 109 S.Ct. 1698, 1715–16, 104 L.Ed.2d 209 (1989), the Supreme Court held the Interstate Commerce Clause does not apply to Indian tribes:

> "The objects to which the power of regulating commerce might be directed, are divided into three distinct classes—foreign nations, the several states, and Indian Tribes. When forming this article, the convention considered them as entirely distinct." In fact, the language of the Clause no more admits of treating Indian tribes as States than of treating foreign nations as States.

*Id.* (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 18, 8 L.Ed.25 (1831)). The Court went on to say

> [m]ost notably, as our discussion of Cotton's "multiple taxation" argument demonstrates, the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce "among" States with mutually exclusive territorial jurisdictions to trade "with" Indian tribes. *Id.* 109 S.Ct. at 1716.

Nor is the Indian Commerce Clause applicable. The central function of that clause "is to provide Congress with plenary power to legislate in the field of Indian affairs," not to maintain free trade among the States. *Id.*

The Tribes and their legislative and executive bodies are DISMISSED on sovereign immunity grounds. The District Court's decision is AFFIRMED as to the remaining defendants.

---

10. *Phillips Petroleum Co. v. United States Environmental Protection Agency*, 803 F.2d 545 (10th Cir.1986), cited by appellants, is distinguishable. In that case, the court implied coverage of Indian reservations by the Safe Drinking Water Act. The statutory language contained ambiguous references to Indians, the legislative history clearly showed congressional intent to include Indian reservations, and the Tribes supported an interpretation of the statute equating Indian reservations to states. *Id.* at 555–56. The court could also infer congressional intent from Congress' 1986 amendment of the statute to specifically include Indian reservations. *Id.* at 548.