KENAI OIL AND GAS, INC., a corporation, Bow Valley Petroleum, Inc., a corporation, for themselves and for all others similarly situated, Plaintiffs,

v.

The DEPARTMENT OF the INTERIOR of the United States; James G. Watt, individually and as Secretary of the Interior; the Bureau of Indian Affairs; Thomas Fredricks or his successor, individually and as Commissioner of the Bureau of Indian Affairs; Curtis Geiogamah, individually and as Acting Area Director of Indian Affairs, Phoenix Area; L. W. Collier, Jr., individually and as Superintendent of the Bureau of Indian Affairs, Uintah and Ouray Agency; Ute Indian Tribe, a federal corporation; and Ruby Black, Charles Redfoot, Antone Appawoo, Floyd Wopsock, Leon Perank, Ouray McCook, Sr., individually and as members of the Ute Tribal Council, Defendants.

Civ. No. C 81–0203A.

United States District Court,
D. Utah, C. D.

Sept. 15, 1981.

---

F. Alan Fletcher, Lawrence S. Skiffington, Salt Lake City, Utah, for plaintiffs.

William McConkie, Wallace Boyack, Asst. U. S. Atty., Francis M. Wikstrom, U. S. Atty., Salt Lake City, Utah, Martin Seneca, Washington, D. C., Woodrow Sneed, Ft. Duchesne, Utah, for defendants.

ALDON J. ANDERSON, District Judge.

1. INTRODUCTION

Plaintiffs filed a Motion for Extension of Lease Suspension and Preliminary Injunction on April 1, 1981, supported by a Memorandum of Points and Authorities filed April 16, 1981. A hearing was held May 8, 1981, at which the court heard testimony, received exhibits, and heard oral argument. The motion seeks a continuation of an order previously issued on March 23, 1981, which had the effect of suspending the expiration of certain oil and gas mining leases of Indian tribal land that would otherwise have expired on or about March 23, 1981. The parties have stipulated that the March 23 order be extended until the court shall have ruled on plaintiffs' motion for an extension. Pursuant to the stipulation the court so ordered, in an order filed April 16, 1981. Plaintiffs had previously tendered communitization agreements to the Indian defendants and to defendant Secretary of the Interior, through his representative for the Uintah and Ouray Agency of the Bureau of Indian Affairs which, had they been approved, would have effectively continued the leases for the duration of the period during which oil was produced in paying quantities. Plaintiffs assert that defendants had a duty to accept and approve the communitization agreements and that their failure to do so gives rise to an actionable claim.

The amended complaint asserts that the court has jurisdiction under 28 U.S.C. §§ 1331 and 1361. Although subject matter jurisdiction with respect to the Indian defendants had not been pled with particularity, as required by Rule 8(a)(1) of the Federal Rules of Civil Procedure, the court believes that the controversy may involve a federal question sufficient to satisfy the jurisdictional requirements of section 1331. At least, for the purposes of this motion and considering the likelihood that plaintiffs will amend their complaint to plead jurisdiction with greater specificity, the court will give plaintiffs the benefit of the doubt.

In seeking a preliminary injunction plaintiffs have the burden of establishing (1) substantial likelihood that they will eventually prevail on the merits; (2) a showing that they will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to plaintiffs outweighs whatever damage the proposed injunction may cause defendants; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). Having heard the evidence presented at the hearing the court is persuaded that if the injunction is not granted then plaintiffs will suffer irreparable harm. If no injunction is issued they will suffer the loss of those leases that would have previously expired by their own terms but for the court's order temporarily suspending the leases. Damages incurred because of the loss of the leases would be difficult, if not impossible, to measure monetarily. The court feels also that plaintiffs have met their burden of showing that the threatened injury they would suffer if the leases lapse outweighs any damages resulting to defendants if the injunction is granted. Nor would the injunction be adverse to the public interest. The court, however, is not convinced that there exists a substantial likelihood that plaintiffs will eventually prevail on the merits. Having failed in respect to this element plaintiffs' motion must be denied.

The tribal defendants in this case are the Ute Indian Tribe, a federal corporation, and individual members of the Ute Business Committee, referred to in the amended complaint as the "Ute Tribal Council." The evidence shows that, pursuant to section 17 of the Indian Reorganization Act, 25 U.S.C. § 477, the Ute Indian Tribe of the Uintah and Ouray Reservation chartered the de-

fendant corporation on July 6, 1938. The tribe had previously been organized, having adopted a constitution and bylaws, pursuant to section 16 of the Act. 25 U.S.C. § 476. The corporation was chartered under the corporate name "The Ute Indian Tribe," and was formed "to further the economic development of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah." Corporate Charter, § 1. Section 5 of the charter enumerates certain corporate powers to be possessed by the corporation. Included in the enumeration is the following provision:

> 5. The Tribe, subject to any restrictions contained in the Constitution and By-laws of the said Tribe, shall have the following corporate powers, in addition to all powers already conferred or guaranteed by the tribal constitution and by-laws:
>
> . . . .
>
> (i) To sue and be sued in courts of competent jurisdiction within the United States; but the grant or exercise of such power to sue and to be sued shall not be deemed a consent by the said Tribe or by the United States to the levy of any judgment, lien, or attachment upon the property of the Tribe other than income or chattels specially pledged or assigned.

The present controversy involves thirty oil and gas leases, entered into in 1971, of property located on the Uintah and Ouray Indian Reservation. The complaint alleges that the original lessees assigned their interests to plaintiff Bow Valley Petroleum, Inc., which in turn entered into a farm-out agreement with plaintiff Kenai Oil and Gas, Inc. Each of the leases contained the following provision:

> Unit Operation.—The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision.

Plaintiffs assert that defendants were bound by this provision to enter into the proposed communitization agreements. They are requesting that the court use its equity power to order that defendants enter into the agreements, including any necessary approval of the Secretary of the Interior.

## 2. WHO ARE THE LESSORS?

The determination as to who the lessors were is relevant to the question of immunity, raised as a defense by the Indian defendants. The unitization provision contained in all the leases by its terms binds only the parties to the lease contracts. There is no dispute that plaintiffs are parties to the contracts, as successors in interest to the original lessees. Who the lessors were, however, is not so certain. The court is powerless to order any but the lessors, their assigns, or successors, to comply with the provisions of the contract.

The thirty leases are attached as exhibits to the amended complaint, Exhibits A through DD. Each of the leases was executed on a printed form on which the blanks were filled in. Two forms were used, each apparently originating with the Bureau of Indian Affairs of the Department of the Interior, Form 5–154h (Jan. 1962), and Form 5–157 (July 1964). Form 5–154h was used where the lessor was an allottee of the tribal lands to be leased. Lease 2685 (Exhibit B) is typical of the twenty-three leases executed on Form 5–154h (the italicized portions represent those parts of the lease in which blanks were filled in on the printed form):

> THIS INDENTURE OF LEASE, made and entered into in quintuplicate this *1st* day of *March, 1971,* by and between *Tommy Thompson, a widower* of *Bandlett,* State of *Utah,* allottee No. *237, U&W,* of the *Ute* Tribe of Indians, lessor, and *Chevron Oil Company, a California corporation, P. O. Box 599* of *Denver,* State of *Colorado 80201,* lessee [.]

Form 5–154h was used in twenty-three leases, numbered respectively: 2685 (Exhibit B), 2686 (Exhibit C), 2704 (Exhibit D), 2750

(Exhibit E), 2807 (Exhibit F), 2808 (Exhibit G), 2668 (Exhibit H), 2669 (Exhibit I), 2758 (Exhibit J), 2759 (Exhibit K), 2692 (Exhibit L), 2745 (Exhibit M), 2670 (Exhibit N), 2693 (Exhibit P), 2761 (Exhibit R), 2746 (Exhibit V), 2694 (Exhibit W), 2695 (Exhibit X), 2674 (Exhibit Y), 2675 (Exhibit Z), 2673 (Exhibit AA), 2755 (Exhibit BB), 2756 (Exhibit CC). In all of these leases the lessors are individual members of the tribe. Defendant Ute Indian Tribe, the tribal corporation, is not named as a party, nor do any of the above-listed leases contain the signature of anyone authorized to act in its behalf. The unitization provision of the lease, paragraph 11 of those leases executed on Form 5–154h, provides that the parties to the lease will be bound to enter into an adopted and approved communitization agreement. It is an elementary principle of contract law that a nonparty to a contract is not bound thereby. Since, therefore, the corporation is not a party to any of these leases, it is not bound thereby. The amended complaint must fail on those claims asserted against the tribal corporation with regard to those leases in which it is not a party. The court acknowledges the possibility, however, that plaintiffs may amend the complaint to include these individual lessors. The doctrine of tribal sovereign immunity does not immunize individual members of a tribe. *Puyallup Tribe v. Washington Game Department*, 433 U.S. 165, 171–72, 97 S.Ct. 2616, 2620–2621, 53 L.Ed.2d 667 (1977). The consequences of that possibility are discussed in section 4 *infra*.

The tribal corporation is mentioned by name in only seven of the leases. Defendants claim that these leases were entered into by the Tribal Business Committee in behalf of the tribal organization and not the tribal corporation. The Tribal Business Committee is the governing body of the Ute Indian Tribe of the Uintah and Ouray Reservation, organized pursuant to section 16 of the Indian Reorganization Act. Constitution and By-laws of the Ute Indian Tribe of the Uintah and Ouray Reservation, art. III, § 1. Article VIII, § 3, of the Constitution and By-laws specifically gives to the Tribal Business Committee the power to lease tribal lands, with the approval of the Secretary of the Interior, and for such periods of time as are permitted by law. The Tribal Business Committee is also granted certain powers by the Corporate Charter of the Ute Indian Tribe of the Uintah and Ouray Reservation, including the power "[t]o purchase, take by gift, bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal," subject to certain enumerated limitations. Corporate Charter § 5(b). The Tribal Business Committee thus has power to lease land to the extent that an interest in land has been conveyed to the corporation. One of the questions before the court is whether the Tribal Business Committee executed these seven leases acting in behalf of the section 16 tribal organization or the section 17 tribal corporation.

Form 5–157 was used in the seven leases that mention the tribal corporation, numbered respectively: 2667 (Exhibit A), 2717 (Exhibit O), 2658 (Exhibit Q), 3101 (Exhibit S), 2661 (Exhibit T), 2660 (Exhibit U), and 2662 (Exhibit DD). Though the substantive provisions of these seven leases are essentially the same as those leases that used Form 5–154h, there is a significant difference with respect to the first part of the lease in which the parties are named. Lease 2717 (Exhibit O) is typical of all but two, 2660 and 2667, of the seven leases for which Form 5–157 was used (the italicized portions again represent those parts of the lease in which blanks were filled in on the printed form):

THIS INDENTURE OF LEASE made and entered into in quintuplicate, this *27* th day of *January, 19*71, by and between *The Ute Indian Tribe, a Federal Corporation chartered under the Act of June 18, 1934 (46 [48] Stat. 984) and the Ute Distribution Corporation, a Utah Corporation* of *Fort Duchesne*, State of *Utah*, for and on behalf of the *Ute* Tribe of Indians, lessor, and *The Ute Distribution Corporation, designated herein as Lessor, and Shell Oil Company, a Delaware Corporation, 1700 Broadway* of *Denver*, State of *Colorado 80202*, lessee[.]

The above-quoted lease provision seems to indicate that the Ute Indian Tribe, a federal corporation, and the Ute Distribution Corporation were acting as agents "for and on behalf of" the Ute Tribe of Indians and the Ute Distribution Corporation, both of which are designated as lessors. The Ute Distribution Corporation was apparently acting in its own behalf as both agent and lessor.

▇ Leases 2667 (Exhibit A) and 2660 (Exhibit U) differ from the other five in that they mention individual Indians as well as the two corporations. For example, lease 2667 indicates that it was entered into between

> Chauncey Cuch, a widower, during his lifetime or until April 13, 1975, whichever is the shorter period of time, and thereafter the Ute Indian Tribe, a Federal corporation chartered under the Act of 6–18–34, 48 Stat. 984, and the Ute Distribution Corporation, a Utah corporation and the Ute Indian Tribe, a Federal corporation, and The Ute Distribution corporation, a Utah corporation of Fort Duchesne, State of Utah, for and on behalf of the Chauncey Cuch, L. E. and the Ute Tribe of Indians, lessor, and the Ute Distribution Corporation, on their own behalf and as remainderman, designated herein as lessors, and Chevron Oil Company, a California corporation, P. O. Box 599 of Denver, State of Colorado 80201, lessee [.]

Lease 2660 (Exhibit U) is identical to lease 2667, except that the names of the individual Indians are different. These two leases, 2660 and 2667, are somewhat confusing. The words "for and on behalf of" in lease 2660, for example, seem to indicate an intent that Chauncey Cuch and, after April 13, 1975, or his death, the two corporations act as agents for the lessors Chauncey Cuch, the Ute Tribe of Indians, and the Ute Distribution Corporation "on their own behalf and as remaindermen." The use of the word "remaindermen" is difficult to understand. It is possible that it is referring to the Ute Tribe of Indians and the Ute Distribution Corporation as successors in interest to Chauncey Cuch as of his death or April

13, 1975, whichever occurred first. Under that interpretation it may be inferred that the language in the lease before the words "for and on behalf of" was intended as a designation of the lessors rather than as a designation of the agents of the lessors. It is possible, therefore, with respect to leases 2667 and 2660, that it was intended that the corporation Ute Indian Tribe be a lessor. Confusion results, however, under this interpretation because the tribal corporation is not specifically mentioned as a lessor in that part of the lease following the words "for and on behalf of." Only Cuch, the Ute Distribution Corporation, and the Ute Tribe of Indians are mentioned as lessors. Plaintiffs have argued that the words "Ute Tribe of Indians" (the italics indicate a filled-in blank on the printed form) refer to the section 17 tribal corporation rather than to the section 16 tribal organization. The court considers that the fact that the lease was written on a preprinted form with the line blank immediately before the printed words "Tribe of Indians" argues against that interpretation. Also relevant is the fact that the tribal corporation is referred to with particular detail at the first part of the lease. Had it been intended that "Ute Tribe of Indians" refer to the corporation the court believes that a greater effort would have been made to refer to it with the same specificity. But if the lease is interpreted as designating the tribal corporation as a lessor rather than as an agent then the only consistent interpretation of the words "Ute Tribe of Indians" is that they refer not to the tribal organization but to the tribal corporation, as plaintiffs argue. If, in leases 2667 and 2660, the words "Ute Tribe of Indians" refer to the section 17 tribal corporation and not to the section 16 tribal organization, then it is also possible that, in leases 2717, 2658, 3101, 2661, and 2662, the same words also refer to the corporation. Utah courts follow the general rule that where two or more instruments are executed contemporaneously, or at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed

together to determine the respective rights and interests of the parties. *Bullfrog Marina, Inc. v. Lentz*, 28 Utah 2d 261, 501 P.2d 266, 271 (1972). Here, the interpretation of leases 2667 and 2660 has significant relevance to the meaning of the provisions of the other five leases. This is, admittedly, only one of several possible interpretations, but the court must look at such possibilities in order to determine whether plaintiffs have met their burden of demonstrating a likelihood of success on the merits.

Of additional significance to the meaning of the seven leases are the portions of the leases that contain the signatures of those involved with the execution. All seven leases were signed by the Chairman of the Tribal Business Committee. Each lease indicates that the Chairman of the Business Committee was signing in behalf of the Ute Indian Tribe, the tribal corporation. This is evidenced more clearly by the notarization portions of the seven leases. The notarization portion of lease 2667, signed by notary Lionel C. Jensen, is typical of all seven leases:

> On the 2nd day of March, 1971, personally appeared before me FRANCIS WYASKET and MILLICENT M. NATCHEES who being by me duly sworn (or affirmed) did say that they are the Chairman and Secretary, UINTAH AND OURAY TRIBAL BUSINESS COMMITTEE of the Ute Indian Tribe, and that said instrument was signed in behalf of said corporation by authority of its by-laws... resolution of its Board of Directors, and said FRANCIS WYASKET and MILLICENT M. NATCHEES acknowledged to me that said corporation executed the same.

The language of the notarization leaves no doubt that the signature of the Chairman of the Business Committee on each of the seven leases was on behalf of the tribal corporation. It further indicates that the lease instrument was executed by the corporation. It is not clear, however, whether the corporation was executing the lease as agent or as lessor.

The tribal defendants assert that the tribal corporation could not have leased the property because there is no evidence that the property was ever transferred or conveyed to the corporation. As noted earlier the Tribal Business Committee was given power in the corporate charter to own and manage interests in real property. That the corporation could not lease what it did not own is implicit in the charter. *See Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp. 1127, 1135 (D. Alaska 1978); *Atkinson v. Haldane*, 569 P.2d 151, 171–72 (Alaska 1977). At the hearing defendants called Wilber Cuch as a witness. He had served as a member of the Tribal Business Committee during the time that the leases were executed. He testified that the leases executed by the Committee were in behalf of the tribal organization and not the tribal corporation. He further testified that no assets had been transferred to the corporation, and that the corporation did not have possession of any interest in the property that it could have leased. The parties stipulated that two other members of the Tribal Business Committee, Irene Cuch and Charles Redfoot, would testify the same as did Wilber Cuch. On cross-examination Wilber Cuch stated that the corporate name was never used by the Business Committee. This is obviously not true since the seven leases mention the corporation as either lessor or agent, and were all executed by the corporation. Plaintiffs did not proffer any evidence to the contrary, that the tribal corporation did have an interest in the leased lands. Whether the corporation did indeed possess an interest in the tribal lands that it could have leased is a question of fact that the court is unable to determine at this time.

After careful examination of the lease documents and of the evidence presented at the hearing the court is of the opinion that, without more, it is unable to determine at this time whether the tribal organization or the tribal corporation was the lessor of the property leased in the seven leases. Without having determined what would be the likely resolution of the lessor issue at a trial on the merits the court will proceed to

**528**

discuss the immunity issue, considering both possibilities.

### 3. SOVEREIGN IMMUNITY

■ a. *The tribal corporation as lessor* —The significance of the possibility that the tribal corporation was one of the lessors lies in the fact that the corporate charter contained a "sue and be sued" clause. The effect of this would be to waive any immunity to which the corporation might otherwise have been entitled. *See Fontelle v. Omaha Tribe of Nebraska*, 430 F.2d 143, 147 (8th Cir. 1970); *Maryland Casualty Co. v. Citizens National Bank of West Hollywood*, 361 F.2d 517, 521 (5th Cir. 1966), *cert. denied*, 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966); *Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp. at 1136; *Brunette v. Dann*, 417 F.Supp. 1382, 1385 (D.Idaho 1976); *Pambrun v. Blackfeet Tribe*, 400 F.Supp. 1394, 1395 (D.Mont. 1975); *Enterprise Electric Co. v. Blackfeet Tribe of Indians*, 353 F.Supp. 991, 992 (D.Mont.1973); *Atkinson v. Haldane*, 569 P.2d at 174; *Martinez v. Southern Ute Tribe*, 150 Colo. 504, 374 P.2d 691, 694 (1962).

If the tribal corporation was not a lessor but only an agent for the lessors, then, as a matter of law, the corporation was not a party to the contract. *Restatement (Second) of Agency* § 320 states:

> Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.

*See Seigworth v. State*, 91 Nev. 536, 539 P.2d 464, 466 (1975); *Kure v. Chevrolet Motor Division*, 581 P.2d 603, 609 (Wyo. 1978). The language "for and on behalf of" in the seven leases is an indication that the corporation may have been only an agent. If that is the case, then, under the above-cited rule, the corporation would not be considered a party to the contracts since the principals were clearly disclosed. Not being a party the corporation could not be sued thereon and plaintiffs are unable to have the benefits of the "sue and be sued" clause in the corporate charter.

■ The possible applicability of the "sue and be sued" clause merits an additional comment respecting jurisdiction. The clause does not of itself act as a grant of federal jurisdiction. It acts only as a waiver of immunity. Federal courts are courts of limited jurisdiction, and in order for this court to take jurisdiction plaintiffs would have to demonstrate that an independent basis of jurisdiction existed. *See Pambrun v. Blackfeet Tribe*, 400 F.Supp. at 1395. As mentioned above, plaintiffs have pled jurisdiction as to the Indian defendants under 28 U.S.C. § 1331, but failed to specify the particular provisions of "the Constitution, laws, or treaties of the United States" under which their claims arose. The applicability of the "sue and be sued" clause will be subject to a showing that the court does have jurisdiction, under section 1331 or otherwise.

b. *The tribal organization as lessor* —The court observes that the tribal organization, officially known as the Ute Indian Tribe of the Uintah and Ouray Reservation, is not named as a defendant here. Only the tribal corporation is so named. If the tribal organization were determined to be the lessor of the seven leases then it would need to be joined to the suit as an indispensible party, under Rule 19, Federal Rules of Civil Procedure. The question here is thus whether tribal sovereign immunity would bar the Tribe's joinder as a party defendant. *See Tewa Tesuque v. Morton*, 498 F.2d 240, 242 (10th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975).

Whether the tribal organization is protected by immunity is a significant question. The tribal defendants have moved to dismiss the action based on an asserted immunity from suit in this type of action. They place heavy reliance on the recent Supreme Court decision in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), which involved a suit brought under the Indian Civil Rights Act. 25 U.S.C. § 1302. The Court there held that Indian tribes are afforded a broad "common-law immunity from suit tradition-

ally enjoyed by sovereign powers." *Id.* at 58, 98 S.Ct. at 1677. The Court noted further:

> This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But "without congressional authorization," the "Indian Nations are exempt from suit." *United States v. United States Fidelity & Guaranty Co.,* [309 U.S. 506, at 512, 60 S.Ct. 653, at 656, 84 L.Ed. 894].

*Id.* The Court concluded that the only action against an Indian tribe specifically allowed by Congress was for federal habeas corpus, under 25 U.S.C. § 1303. The Indian Civil Rights Act did not, on its face, subject tribes to the jurisdiction of federal courts in civil actions for injunctive or declaratory relief. *Id.* at 59, 98 S.Ct. at 1677. The Court acknowledged that a tribe's sovereign immunity could be waived, but stated that such a waiver " 'cannot be implied but must be unequivocally expressed.' " *Id.* at 58, 98 S.Ct. at 1677. As noted in the previous subsection, the "sue and be sued" clause is an explicit waiver as to the corporation.

Plaintiffs' response to the tribal defendants' claim of immunity focuses, in part, on the court of appeals' decision in *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes,* 623 F.2d 682 (10th Cir. 1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 [hereinafter *Dry Creek Lodge II*]. Plaintiffs had there alleged a violation of the Indian Civil Rights Act and had brought an action against two Indian tribes in federal court. The district court dismissed the complaint for damages for lack of jurisdiction. On appeal the court of appeals reversed and remanded. *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926 (10th Cir. 1975) [hereinafter *Dry Creek Lodge I*]. While the case was being tried on remand the Supreme Court handed down the *Santa Clara* decision. The trial court thereupon dismissed the action, believing that it had no jurisdiction. The dismissal was appealed. The court of appeals reversed and remanded in the *Dry Creek Lodge II* decision. The opinion emphasized the need for a forum in which the plaintiffs' claim could be heard. The court read the

*Santa Clara* decision as not necessarily foreclosing an action in federal court if no tribal remedy existed:

> By the decision in *Santa Clara* the tribal members seeking injunctive relief under the Indian Civil Rights Act were in substance directed to the remedies available to them in their own tribal courts and from the officials they had elected. Much emphasis was placed in the opinion on the availability of tribal courts and, of course, on the intratribal nature of the problem sought to be resolved. With the reliance on the internal relief available the Court in *Santa Clara* places the limitations on the Indian Civil Rights Act as a source of a remedy. But in the absence of such other relief or remedy the reason for the limitations disappears.
>
> The reason for the limitations and the references to tribal immunity also disappear when the issue relates to a matter outside of internal tribal affairs and when it concerns an issue with a non-Indian.
>
> It is obvious that the plaintiffs in this appeal have no remedy within the tribal machinery nor with the tribal officials in whose election they cannot participate. The record demonstrates that plaintiffs sought a forum within the Tribes to consider the issue. They sought a state remedy and sought a remedy in the federal courts. The limitations and restrictions present in *Santa Clara* should not be applied. There has to be a forum where the dispute can be settled.

623 F.2d at 685. *But see Boe v. Fort Belknap Indian Community,* 642 F.2d 276, 278–80 (9th Cir. 1981); *Trans-Canada Enterprises, LTD. v. Muckleshoot Indian Tribe,* 634 F.2d 474, 476–77 (9th Cir. 1980); *R. J. Williams Co. v. Fort Belknap Housing Authority,* 509 F.Supp. 933, 938–41 (D.Mont.1981).

■ Plaintiffs' reliance on *Dry Creek Lodge II* is misplaced. The issue in that case, as in *Santa Clara,* was whether the Indian Civil Rights Act afforded a remedy in federal court to one who alleges a violation of his rights thereunder. The general

rule prior to the Act was that an Indian tribe could not be sued without its consent. *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512–13, 60 S.Ct. 653, 656–657, 84 L.Ed. 894 (1940). *See Manygoats v. Kleppe*, 558 F.2d 556, 557 (10th Cir. 1977); *Cherokee Nation v. State of Oklahoma*, 461 F.2d 674, 681 (10th Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972). Following the passage of the Indian Civil Rights Act in 1968 courts interpreted it as a congressional waiver of Indian immunity respecting claims brought under the Act. *See, e. g., Dry Creek Lodge I*, 515 F.2d at 933–34. The decision in *Santa Clara* held, simply, that the Act was not a waiver of immunity except for the provision of a federal habeas corpus remedy. This court reads the *Dry Creek Lodge II* opinion as holding that there are occasions when tribal immunity would not bar federal jurisdiction over any action brought under the Indian Civil Rights Act. In the present case, however, plaintiffs have not pled a violation of the Act. Rather, they have made claims against the tribal defendants for breach of the lease contracts. These claims are not actionable under the Act. Although plaintiffs assert, in their Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss, at 7, that they "have also claimed violation of their civil rights, in that the Ute Tribe has denied them 'the equal protection of its laws' and has deprived them of their 'property without due process of law,'" no such claims are apparent in either the original complaint or the two amended complaints. Nor have plaintiffs alleged facts, which, if taken as true, would give rise to a claim under the Indian Civil Rights Act. Under the traditional sovereign immunity afforded to Indian tribes the Ute Tribe, as organized under section 16 of the Indian Reorganization Act, cannot be sued in contract without having first given its consent. Thus, plaintiffs' contract claims against the tribal Indian defendants are barred in this court for lack of jurisdiction.

Even if *Dry Creek Lodge II* is read as not being limited to cases under the Indian Civil Rights Act, but as allowing a federal district court to take jurisdiction, under certain conditions, over a claim in contract against the tribe, the court is still of the opinion that plaintiffs' claims are barred for having failed to meet those conditions. The opinion in *Dry Creek Lodge II* seems to say, in essence, that where no tribal remedy is available a plaintiff may have access to a federal forum. The rule prior to *Santa Clara* was similar, requiring that a plaintiff exhaust tribal remedies before bringing a federal action under the Indian Civil Rights Act. *See McCurdy v. Steele*, 506 F.2d 653, 656–67 (10th Cir. 1974). Plaintiffs in the *Dry Creek Lodge* cases did seek a tribal remedy initially, but found no satisfactory forum in which to air their complaint. The court of appeals observed that "[i]t is obvious that the plaintiffs in this appeal have no remedy within the tribal machinery nor with the tribal officials in whose election they cannot participate." 623 F.2d at 685. The opinion implies that where a tribal remedy was sought and none existed then a federal court may take jurisdiction. But no federal jurisdiction is found until an attempt at seeking a tribal remedy has shown that none exists. A similar situation occurred in *McCurdy v. Steele*, 353 F.Supp. 629 (D.Utah 1973), *rev'd*, 506 F.2d 653 (10th Cir. 1974). Plaintiffs there had brought an action under the Indian Civil Rights Act claiming improprieties in the election of the tribal business council. Defendants urged that the court had no jurisdiction under the Act since plaintiffs had not exhausted their tribal remedies. The trial court held that because no judicial system for the hearing of such matters existed there was no requirement that tribal remedies be exhausted. 353 F.Supp. at 636. The court of appeals reversed and held that inherent in the authority to govern itself was the authority of the tribe to determine the manner in which differences were to be resolved and the manner in which its leaders were to be selected. Considering that the Act was intended to interfere only minimally with tribal political processes the court stated that the controversy "demands in the first instance an opportunity for a tribal solu-

tion." 506 F.2d at 656–57. Although the present dispute does not involve intratribal issues, as did *McCurdy*, consideration of *Dry Creek Lodge II* together with *McCurdy* requires the conclusion that federal jurisdiction would obtain over an action against an Indian tribe only if no tribal remedy exists. The conclusion that there is no tribal remedy will only be made where, as in *Dry Creek Lodge*, plaintiffs have affirmatively sought a tribal remedy. If there is a tribal remedy, then, under *Dry Creek Lodge II*, this court cannot have jurisdiction. This is so even though plaintiffs' efforts result in an adverse decision in the tribal forum. Only where plaintiffs' efforts to obtain a tribal remedy have demonstrated that no such remedy is available will this court take jurisdiction.

Plaintiffs assert that recourse to the Ute tribal courts would be futile, and that the requirement that they exhaust tribal remedies is thus satisfied. They cite the provisions of the Law and Order Code for the Ute Indian Tribe of the Uintah and Ouray Reservation to show that it would be impossible for them to obtain a fair hearing of their complaint in the tribal court. These assertions are not well-taken, however. This is exactly the kind of case contemplated by the Supreme Court when it stated, in *Santa Clara*: "Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians. . . . Nonjudicial tribal institutions have also been recognized as competent law-applying bodies." 436 U.S. at 65–66, 98 S.Ct. at 1680–1681 (footnotes and citations omitted). Contrary to plaintiffs' assertions, the provisions of the Law and Order Code are a prima facie demonstration that an adequate tribal remedy exists within which plaintiffs may bring their claims. That remedy must be shown to be nonexistent by an actual attempt before this court will have jurisdiction.

c. *The claim against the members of the Tribal Business Committee*—Plaintiffs have asserted claims against the members of the Business Committee as individuals. The de-

fendant Committee members have moved to dismiss, asserting that they are protected from suit by tribal sovereign immunity. Plaintiffs respond by arguing that the Committee members are not shielded by the tribe's immunity, citing the statement in *Puyallup Tribe v. Washington Game Department*, 433 U.S. 165, 171–72, 97 S.Ct. 2616, 2620, 2621, 53 L.Ed.2d 667 (1972), that the doctrine of tribal sovereign immunity "does not immunize the individual members of the tribe," and the statement in *Santa Clara Pueblo v. Martinez*, 436 U.S. at 59, 98 S.Ct. at 1677, that "[a]s an officer of the Pueblo, petitioner Lucario Padilla is not protected by the tribe's immunity from suit." The *Santa Clara* Court cites *Puyallup* and *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), as authority.

The court is of the opinion that the claims against the members of the Business Committee are essentially against the tribe itself and are thus barred from this court's jurisdiction by the tribe's sovereign immunity. This is not a case appropriate for the application of the *Ex parte Young* doctrine. *Puyallup* is similarly inapplicable. The issue there dealt with the amendability to suit of individual tribal members. The issue in the present case is whether the court has jurisdiction to grant an injunction ordering the members of the Business Committee to sign the communitization agreements—something the court would be powerless to order the tribe to do because of the immunity doctrine. Tribal immunity may not be evaded by suing tribal officers, as plaintiffs have done in this suit. *Seneca Constitutional Rights Organization v. George*, 348 F.Supp. 48, 50 (W.D.N.Y.1972); *Barnes v. United States*, 205 F.Supp. 97, 100–01 (D.Mont.1962).

### 4. DISCRETION

The court recognizes that to this point there has been little resolution of some of the important issues raised in this motion. The court confesses its inability, without further evidence, to determine whether the tribal organization or the tribal corporation

was the lessor of the seven leases involving nonallotted tribal lands. If the corporation was the lessor, then the "sue and be sued" clause may allow the court to take jurisdiction without hindrance from tribal immunity. If the Tribe was the lessor, then the court could only take jurisdiction if an attempt to obtain a tribal remedy demonstrated that none existed. The court does not see this as a viable possibility. In twenty-three of the leases, as noted above, the lessors were individual Indian allottees. As individuals, they would not be entitled to the protection of tribal immunity, in the event that they were joined to the suit. Plaintiffs have also stated claims against the Department of the Interior, the Secretary of the Interior, the Bureau of Indian Affairs, and other government officials. The possibility thus exists that the court may have jurisdiction over claims against the lessors of the twenty-three allottee leases, the tribal corporation, and the various government agencies or officers named as defendants.

Both the government and Indian defendants have asserted that even if jurisdiction over these defendants is not barred by tribal immunity no likelihood of success on the merits is apparent because the Secretary of Interior properly exercised his discretion in refusing to approve the communitization agreements. Approval of a communitization agreement, such as is in issue in this case, is within the discretion of the Secretary. 25 U.S.C. § 396d states:

All operations under any oil, gas, or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of sections 396a–396g of this title shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease.

Regulations promulgated at 25 C.F.R. § 171.21(b) (1980) require that the Secretary's approval be given of each such cooperative agreement:

All such leases shall be subject to any cooperative or unit development plan affecting the leased lands that may be required by the Secretary of the Interior, but no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected.

Each of the leases similarly provides as follows:

Unit Operation.—The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision.

Plaintiffs urge that the above provisions do not vest the Secretary with discretion to reject a communitization agreement that has been approved already by the Indians, except as necessary to protect tribal natural resources. The evidence presented at the hearing, particularly the testimony of defendant L. W. Collier, Jr., the Superintendent of the Uintah and Ouray Agency of the Bureau of Indian Affairs, indicated that the primary reason he rejected the proposed communitization agreements was that it was not in the best economic interest of the tribe. He felt that if the leases were allowed to lapse the Indian lessors would be able to re-lease the land to obtain a more favorable royalty rate and bonuses. The Secretary's responsibility to protect the interests of the Indians does not, plaintiffs claim, include within its ambit the discretion to refuse to approve a communitization agreement that may be uneconomical. They argue that the Secretary's discretion extends only to matters of conservation and protection of natural resources.

The government defendants, on the other hand, argue that the discretion vested in

the Secretary is so broad that there are essentially no parameters governing its exercise and that the court thus has no jurisdiction even to review the Secretary's refusal to approve the agreements. The court agrees with the government's position. Not only was there no abuse of discretion on the part of the Secretary, but it is questionable whether the court has jurisdiction to review the exercise thereof.

a. *Jurisdiction*—The language of the statute and regulation cited above do vest the Secretary with very broad power to approve or deny the communitization agreements. The judicial review provisions of the Administrative Procedure Act do not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court noted that that section precludes judicial review only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" 401 U.S. at 410, 91 S.Ct. at 820. The Court of Appeals for the Ninth Circuit has elaborated on the *Overton Park* test in *Strickland v. Morton*, 519 F.2d 467 (9th Cir. 1978). There, the question was whether the district court had jurisdiction to review the Secretary of Interior's denial of appellants' applications for homestead lands. Under 43 U.S.C. §§ 1411–1418 the Secretary was to classify federal public lands as either suitable for disposal or, alternatively, as being of such value as to make them more suitable for the retention in federal ownership. On appeal the court stated:

> [T]he test in *Overton Park* of when a reviewing court lacks jurisdiction due to the provisions of § 701(a)(2), is not whether a statute viewed in the abstract lacks law to be applied, but rather, whether *"in a given case"* there is no law to be applied. When a court is asked to review agency action in instances where considerable discretion is committed by statute to an official, the court lacks jurisdiction due to the provisions of § 701(a)(2) only when the agency action of which

plaintiff complains fails to raise a legal issue which can be reviewed by the court by reference to statutory standards and legislative intent. Where a statute grants broad discretion to an administrative official, absent some action *clearly* contradictory to a statutory provision of legislative intent ... a plaintiff challenging an exercise of that discretion may find it an all but insurmountable task to be able to bring his case within this standard, but unless he does so § 701(a)(2) deprives the courts of jurisdiction to entertain his case.

*Id.* at 470 (footnote and citation omitted). *See Arizona Power Authority v. Morton*, 549 F.2d 1231, 1239–41 (9th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977); *Sessions Inc. v. Morton*, 348 F.Supp. 694, 699 (C.D.Cal.1972), *aff'd*, 491 F.2d 854 (9th Cir. 1974).

█ The Court of Appeals for the Tenth Circuit has emphasized the narrowness of section 701(a)(2). *Sabin v. Butz*, 515 F.2d 1061, 1065 (10th Cir. 1975); *National Helium Corp. v. Morton*, 455 F.2d 650, 655 n.12 (10th Cir. 1971). This court is of the opinion that the instant case falls within that class of "rare" cases that involve nonreviewable agency action. 25 U.S.C. § 396d and 25 C.F.R. § 171.21 give the Secretary very broad discretion. They do not detail any standard governing the exercise of the discretion. Nor has the court been referred to any provision elsewhere that might limit this seemingly broad discretion. Under section 396d the Secretary has a twofold discretion: (1) to approve as reasonable a cooperative or unit plan; and (2) to make any oil and gas lease subject to the terms of an agreement so approved. Thus, assuming the communitization agreements proposed by plaintiffs were, in fact, reasonable, in order for plaintiffs to prevail they would have to show that Superintendent Collier, as the Secretary's representative, abused his discretion by failing to determine that the agreements were reasonable and by failing to subject the terms of the leases to the communitization. Plaintiffs have not, however, satisfied the court that any stan-

dard exists in the statutory or regulatory scheme by which it could be determined that the Secretary's discretion had been abused. Plaintiffs argue that the Secretary lacked the discretion to refuse to approve the agreements for any reason other than to preserve and develop efficiently natural resources located on Indian land. This conclusion, they urge, follows from an examination of the context of 25 C.F.R. § 171.-21(b). This argument is wholly erroneous and has no basis in the statute or regulation. Accordingly, the court concludes that the agency action of which plaintiffs complain was committed to agency discretion by law.

■ b. *The United States as trustee* —Because plaintiffs' entire case seems to hinge on their assertion that, as a matter of law, the Secretary had a duty to approve the proposed communitization agreements the court feels compelled to address that argument further. The broad discretion vested in the Secretary to approve or disapprove the communitization agreements is a function of the fiduciary responsibilities vested in the United States as trustee of Indian lands and of the Indians themselves. Defendants have stated accurately that the relationship between the government and an Indian tribe is a trust relationship established for the protection of the Indians. Chambers & Price, "Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands," 26 *Stanford L.Rev.* 1061 (1974), provides a succinct history of the legal relations between Indian tribes and the government:

> Reservation land is generally held in fee by the United States in trust for the tribe or individual Indian allottees. The origins of this trust title are somewhat obscure. We know of no treaty which states that tribal lands shall be held in trust; however, in interpreting early federal treaties, the Supreme Court concluded that they establish a relationship between the United States and Indian tribes "perhaps unlike that of any other two people in existence" and that the tribe's "relation to the United States re-

sembles that of a ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16–17 [8 L.Ed. 25] (1831). By the end of the 19th century, the Court was more definite; in *United States v. Kagama*, 118 U.S. 375, 383–84 [6 S.Ct. 1109, 1113–1114, 30 L.Ed. 228] (1886), it observed: "These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States . . . . From their very weakness and helplessness . . . there arises the duty of protection and with it the power." Subsequent cases have held that the federal government in its management of Indian lands and other trust property (such as tribal funds) owes duties of the "highest responsibility and trust" and is bound to adhere to "the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 297 [62 S.Ct. 1049, 1054, 86 L.Ed. 1480] (1942); *see United States v. Mason*, 412 U.S. 391, 398 [93 S.Ct. 2202, 2207, 37 L.Ed.2d 22] (1973). The Court has held that the federal government may not "give the tribal lands to others, or . . . appropriate them to its own purposes" without violating the terms of its guardianship. *United States v. Creek Nation*, 295 U.S. 103, 109–10 [55 S.Ct. 681, 684, 79 L.Ed. 1331] (1935); *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 113 [39 S.Ct. 185, 186, 63 L.Ed. 504] (1919).

> With respect to allotted lands, the concept of trust title is directly traceable to the General Allotment Act which specifically provides that the United States shall hold the land "in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." 25 U.S.C. § 348 (1970).

*Id.* at 1061 n.1. *See Sunderland v. United States*, 266 U.S. 226, 233–34, 45 S.Ct. 64, 65, 69 L.Ed. 259 (1924); *Heckman v. United States*, 224 U.S. 413, 438, 32 S.Ct. 424, 431, 56 L.Ed. 820 (1912); *Tiger v. Western Investment Co.*, 221 U.S. 286, 310–11, 31 S.Ct. 578, 584–585, 55 L.Ed. 738 (1911).

■ That the Secretary of the Interior is required to approve transactions involv-

ing Indian land is entirely consistent with the high fiduciary responsibility it has to manage land held in trust for Indian use. As a trustee the Secretary is expected to manage Indian land so as to maximize the benefits obtaining to the Indians. The court is unwilling to admit that the protection afforded by the Secretary does not extend to include overseeing the economic interests of Indian lessors. To the contrary, the devotion of Indian land to uses designed to maximize lease revenues is the conventional goal of trust management. *See* Chambers & Price, *supra*, at 1065. The United States has the duty to get "the best possible price" for the Indians. *Gray v. Johnson*, 395 F.2d 533, 536 (10th Cir.), *cert. denied*, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968). Superintendent Collier was well within his discretion in refusing to approve the communitization agreements, feeling, as he did, that a more favorable royalty rate and bonus might be obtained. Nor were the Indian lessors in breach of the lease contracts. The approval of the Secretary was a condition precedent to any contractual obligation on the part of the lessors to sign the communitization agreements.

### 5. CONCLUSION

The foregoing analysis has demonstrated that there is no likelihood of plaintiffs prevailing at a trial on the merits of this dispute. Even assuming that a trial would show that the tribal corporation was the lessor of the seven tribal leases, and assuming further that the twenty-three individual lessors of the allottee leases would be joined, the court is of the opinion that the Secretary's refusal to approve the communitization agreements was committed to his discretion by law. The court observes, too, that even if the Secretary's exercise of discretion was amenable to judicial review it did not rise to the level of an abuse of discretion. Nor was it arbitrary or capricious.

Accordingly,

IT IS HEREBY ORDERED that plaintiffs' motion for extension of lease suspension and preliminary injunction is denied.

IT IS FURTHER ORDERED that the previous order entered by the court suspending the termination of the leases remain in effect for ten days to allow plaintiffs' application to the Court of Appeals of the Tenth Circuit for a further suspension pending the outcome of any appeal from the instant order or the expiration of time within which an appeal might be brought.